UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON, DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA.<br>Plaintiff,<br><br>v.<br><br>$ 551,699.20 seized from (5) certificates<br>of deposit at AMEGY BANK,<br>under the name EVAN N. JARVIS or<br>EVAN N. JARVIS and GINGER ANN JARVIS;<br><br>$512,593.80 seized from AMEGY BANK,<br>held in the name FAIRVIEW CAPITAL, LLC;<br><br>$75,640.70 seized from TD AMERITRADE,<br>held in the name EVAN N. JARVIS;<br><br>$165,493.92 seized from AMEGY BANK<br>held in the name EVAN N. JARVIS and<br>GINGER ANN JARVIS;<br><br>$144,672.42 seized from BANK OF<br>AMERICA, held in the name NUTECH, INC.;<br><br>AND,<br><br>ALL PROPERTY TRACEABLE TO<br>SUCH PROPERTY, including<br>INTEREST OR OTHER APPRECIATED<br>VALUE, IF ANY.<br>Defendants. | § CIVIL ACTION NO. H-<br>§<br>§<br>§<br>§ |

**COMPLAINT FOR FORFEITURE IN REM**
(AND NOTICE TO POTENTIAL CLAIMANTS)

The United States of America, Plaintiff, alleges upon information and belief


that:

1. This is a civil action *in rem* brought to enforce the provisions of:

a. Title 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of enumerated statutes of Title 18, or any other offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of Title 18), or a conspiracy to commit such offense. The specified unlawful activity and scheme alleged in this complaint includes, but are not necessarily limited to, wire fraud in violation of 18 U.S.C. § 1343 and fraud in connection with the sale of securities in violation of 15 U.S.C. § § 78j(b) and 78ff(a); and

b. Title 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property involved in a transaction or attempted transaction in violation of 18 § 1957, or any property traceable to such property.

Further, 18 U.S.C. § 984, provides for the forfeiture of fungible property, including cash, found in the same place or account as the property involved in the offense, when the action is commenced within one year from the date of the offense(s) as set out in Section 984. Thus, this section is applicable to the defendants as discussed below.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§

1345 and 1355.

    3.     The defendants are:

    A.     Money traceable to the sale of Grifco International, Inc. stock:

    I.     $110,339.84 seized from Amegy Bank, Certificate of Deposit # ending in *383, under the name Evan N. Jarvis and Ginger Ann Jarvis;

    ii.     $110,339.84 seized from Amegy Bank, Certificate of Deposit # ending in*384, under the name Evan N. Jarvis;

    iii.     $110,339.84 seized from Amegy Bank, Certificate of Deposit # ending in *385, under the name Evan N. Jarvis;

    iv.     $110,339.84 seized from Amegy Bank, Certificate of Deposit # ending in *386, under the name Evan N. Jarvis and Ginger Ann Jarvis;

    v.     $110,339.84 seized from Amegy Bank, Certificate of Deposit # ending in *387, under the name Evan N. Jarvis and Ginger Ann Jarvis;

    vi.     and all property traceable to such property, including interest or other appreciated value, if any.

    B.     Money traceable to the sale of NuTech, Inc. stock:

    I.     $512,593.80 seized from an Amegy Bank account held in the name Fairview Capital, LLC, and controlled by Evan Jarvis;

    ii.     $75,640.70 seized from a TD Ameritrade account held in the name Evan Jarvis;

    iii.     $165,493.92 seized from an Amegy Bank account held in the name of Evan N. Jarvis and Ginger Ann Jarvis;

  iv. $144,672.42 seized from a Bank of America account held in the name NuTech, Inc. and controlled by Lois Newman; and

  v. and all property traceable to such property, including interest or other appreciated value, if any.

The defendants were seized in the Southern District of Texas by state law enforcement officers in December of 2007.

4. Evan Nicolas Jarvis, Jim Dial, Lois Newman, and others were involved in wire fraud, fraud in the sale of securities, and money laundering, or a conspiracy to commit these offenses.

5. It is a criminal violation under 18 U.S.C. § 1343 to devise a scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses or representations, and for the purpose of executing the scheme, to cause any writing to be transmitted by means of wire communication in interstate commerce. It is a criminal violation under 15 U.S.C. §§ 78j(b) and 78ff(a) to willfully and with the intent to deceive, manipulate or defraud, employ a scheme to defraud or to make a material misrepresentation or omission in connection with the sale of a security, or to engage in an act, practice or course of business that operates as a fraud or deceit upon a purchaser or seller of a security, and to cause an instrumentality of interstate commerce to be used in furtherance of the fraudulent scheme or act. It is a criminal violation under 18 U.S.C. § 1957 to knowingly

engage or attempt to engage in a monetary transaction in property of a value greater than $10,000.00 that was derived from specified unlawful activity.

6. During the relevant period, Evan Nicolas Jarvis (Jarvis) was a stock promoter. Jarvis, and entities he owned and controlled, generally provided services, advice, management and financial public relations services to public companies in exchange for unrestricted (free-trading) shares of the respective companies' common stock.

7. In 2004, Grifco International, Inc. (Grifco) was incorporated in the State of Nevada, and is purportedly an international provider of oil and gas services equipment. During the relevant period, Grifco was a publicly traded company. Grifco's common stock is not registered with the Securities Exchange Commission (SEC). Grifco's common stock was quoted on the Pink Sheets. "Pink Sheets" refers to over-the-counter trading of stocks that are traded in some context other than on a formal exchange such as the New York Stock Exchange or the American Stock Exchange.

8. During the relevant period, Jim Dial (Dial) was the Chief Executive Officer and President of Grifco, and Lois Newman (Newman) was an officer and employee of Grifco. Jarvis, through companies he owned and controlled, promoted Grifco stock. Although Jarvis was not an employee of Grifco and did not frequent

Grifco's offices, he regularly received Grifco payroll checks and large amounts of free-trading Grifco shares. Newman is Jarvis's mother-in-law.

9. NuTech, Inc. (NuTech) was incorporated in the State of Nevada. NuTech purportedly provides innovative technology solutions for the security industry. Newman is the sole officer of NuTech. NuTech was previously known as CFE Enterprises, Inc. Newman changed the name to NuTech in March 2006. During the relevant period, NuTech was a publicly traded company. NuTech's common stock was not registered with the SEC. NuTech's common stock was quoted on the Pink Sheets.

10. Jarvis, Dial, Newman, and other individuals engaged in a scalping and market manipulation scheme in connection with the promotion and sale of Grifco stock. Jarvis, Newman, and others engaged in a scalping and market manipulation scheme in connection with the promotion and sale of Nutech stock. "Scalping" refers to the practice of recommending that others purchase a security while secretly selling the same security in the market.

11. According to former Grifco employees, between 2005 and 2006, Jarvis, Dial, Newman, and others were involved in the promotion of Grifco "Pink Sheets" stock via press releases. During the same time period, Jarvis received over five million Grifco shares, individually, and received about two million Grifco shares

through his business, Fairview Capital, LLC. Jarvis grossed over $2,000,000.00 from the sale of Grifco shares.

12. The press releases did not mention Jarvis, his holdings of Grifco stock, or his intent to sell Grifco stock. A reasonable investor would consider the fact the Jarvis was involved in both the promotion and sale of Grifco stock a significant fact in making his or her investment decision.

13. Former Grifco employees disclosed that between 2005 and 2006, Jarvis participated in the content and issuance of Grifco's press releases. Moreover, Jarvis's close associate and business partner wrote and edited many of the press releases. Former Grifco employees disclosed that many of these press releases contained materially false and misleading information about Grifco's revenue, product development, and new product information.

14. The press releases were reasonably calculated to influence the investing public. The press releases were issued through Market Wire and Business Wire. Market Wire and Business Wire are news wire services offering press release distribution and other services to public relations, journalists, and other communications specialists. Grifco's press releases were also publicly available on the Internet by using search engines such as Google and Yahoo, or by referencing particular websites such as www.grifco.org; www.smallcapvoice.com.

15. Specific instances of false press releases include those press releases issued in the Summer of 2005. On or about June 16, 2005, Grifco issued a press release touting its production of a "one of a kind" Jet Motor (a tool for use by the oil service industry) that would generate substantial revenues for Grifco. The press release stated that Grifco was nearing completion of 50 Jet Motor units and expected to begin shipping them within three weeks. The press release further stated that it was anticipated that the Jet Motors would generate approximately $2,000,000.00 per month in rental fees with 75% utilization.

16. On or about August 10, 2005, Grifco released a press release stating that it had plans to produce 50 more Jet Motors by the middle of the next month. The press release further stated that the first production run of 50 Jet Motors had already been shipped to clients all over the world, and should be in operation, depending on the logistics of their destinations, by the end of the month. The press release also stated that three of the Jet Motors were currently in operation generating $15,000.00 per day in revenues for Grifco. The press release reiterated that the Jet Motors would generate about $2 million per month in rental fees with 75% utilization.

17. According to a former Grifco employee and designer of the Jet Motor tool, at the time of the above press releases he was still lab-testing the Jet Motor

and production of the Jet Motor was at least two years away when taking into consideration engineering, patenting, field-testing, manufacturing and marketing and renting all 50 Jet Motors. The former Grifco employee disclosed that Grifco had not earned any revenues from the Jet Motor tool, that the $2,000,000.00 revenue projection was completely fabricated. The former Grifco employee stated that when he confronted Dial about these false statements, Dial responded that "You don't understand how you work one of these pink sheets, you've got to feed the machine."

18. The false and misleading press releases appear to have had a material impact on the share price of Grifco's common stock. For example, on the day of Grifco's August 10, 2005, press release that claimed 50 Jet Motors had been shipped all over the world, Grifco's stock price rose nearly 20% (from $0.41 to $0.49) on average daily trading volume that was nearly double (from 660,000 to 1,250,000) the previous day's results.

19. During the relevant time period, Grifco was the subject of spam (mass mailing) email campaigns to induce investors to purchase Grifco stock. The spam emails were designed to create an active market in Grifco shares.

20. The funds in the five certificates of deposit, totaling $551,699.20, seized from Amegy Bank under the name Evan N. Jarvis and Ginger Ann Jarvis,

are traceable to Jarvis's sale of Grifco stock. The funds in each certificate of deposit were also involved in a monetary transaction of more than $10,000.00 that was derived from the wire fraud and securities fraud schemes set out above.

21. In 2007, Jarvis was involved in promoting the sale of Nutech's stock without disclosing that he received and sold a large amount of NuTech shares during the same time period. Jarvis's promotion activities included drafting press releases for NuTech and setting up the website for NuTech.

22. Between May and November 2007, NuTech distributed about 14 press releases through Market Wire. NuTech press releases were publicly available on the Internet using search engines such as google and yahoo, or by referencing particular websites www.Factiva.com, NuTech's website www.nutechinc.net, and NuTech's Investor Fact Sheet on website www.smallcapvoice.com. The press releases were reasonably calculated to influence the investing public.

23. The sale of NuTech stock was also promoted through spam emails. The spam emails were designed to create an active market in NuTech shares. In November 2007, the Securities Exchange Commission (SEC) received complaints about spam emails promoting NuTech shares.

24. During the same time period, Newman as the sole director of NuTech, issued about 2,375,000 of freely-trading shares to Jarvis either individually or

through his company, Fairview Capital, LLC. Jarvis generated about $950,000.00 from the sale of these NuTech shares.

25. The above press releases did not mention Jarvis, his holdings of NuTech stock, or his intent to sell NuTech stock. A reasonable investor would consider the fact the Jarvis was involved in both the promotion and sale of NuTech stock a significant fact in making his or her investment decision.

26. NuTech's website contains a link to www.smallcapvoice.com. Currently, the Investor Fact Sheet for NuTech on the above website states NuTech has 210,745 issued and outstanding shares as of August 20, 2007. On the same date, Newman authorized the issuance of 300,000 NuTech free-trading shares to Fairview Capital; 100,000 NuTech free-trading shares to Jarvis, and 5,000,000 NuTech restricted shares to Newman. Restricted shares are not freely tradeable (e.g. officers typically must hold securities for some period of time before the shares can be traded). Jarvis and Jarvis's company, Fairview Capital, subsequently received approximately 1,975,000 additional NuTech free-trading shares in 2007.

27. Information regarding the number of issued and outstanding shares is important to investors in evaluating the value of each share. A reasonable investor would want to know that the company issued millions of shares to company

insiders.

28. During this time period, Jarvis issued checks on his Fairview Capital account from the amount he received from the sale of NuTech stock to NuTech and these checks were deposited into NuTech's account. Newman is the signatory on NuTech's account.

29. In August 2007, NuTech shares were traded for at least $3.50 per share, and by the end of 2007, NuTech shares were traded for about $0.13 per share.

30. The defendant property, $512,593.80, seized from the Amegy Bank account in the name of Fairview Capital, is traceable to the sale of NuTech stock. Jarvis sold about $671,000.00 in NuTech stock and wire transferred the proceeds from his Fairview Capital brokerage account at Penson Financial to his Fairview Capital account at Amegy Bank.

31. The defendant property, $144,672.42, seized from the Bank of America account in the name of NuTech, is traceable to Jarvis's sale of NuTech stock. Jarvis wrote three checks on his Fairview Capital account at Amegy Bank to NuTech from proceeds of NuTech stock sales on or about September 24, 2007 and September 28, 2007. These checks were deposited into NuTech's account at Bank of America.

32. The defendant property, $75,640.70, seized from TD Ameritrade in the

name of Evan Jarvis was funded from the sale of NuTech stock in November 2007.

33. The defendant property $165,493.92 seized from Amegy Bank in the name of Evan Jarvis and Ginger Jarvis was funded from the sale of NuTech stock beginning September 13, 2007.

34. Jarvis conducted monetary transactions of more than $10,000.00 that were derived from the securities and wire fraud schemes set out above.

35. The defendants are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(1)(A).

## NOTICE TO ANY POTENTIAL CLAIMANT

YOU ARE HEREBY NOTIFIED if you assert an interest in the property subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. The verified claim must be filed no later than 35 days from the date this complaint is sent in accordance with and Rule G(4)(b). The date this complaint is sent in accordance with Rule G(4(b)(iv) is the date stated on the process receipt and return.

An answer or motion under Fed. R.Civ.P. 12 must be filed no later than 20 days after filing the claim. The claim and answer must be filed with the United States

District Clerk for the Southern District of Texas and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this complaint.

## PRAYER

WHEREFORE, the United States of America prays:

1. Summons issue according to the normal procedure of this Court citing all persons having an interest in the above described defendant property to appear on the return day of process by filing a claim and answer pursuant to Rule G, Supplemental Rules for Certain Admiralty and Maritime Claims;

2. That Warrant of Arrest issue commanding the arrest of the property;

3. That judgment of forfeiture to the United States be decreed against the Defendant Currency; and

4. For costs and such other and further relief to which plaintiff may be entitled.

> Respectfully submitted,
>
> DONALD J. DeGABRIELLE, JR.
> UNITED STATES ATTORNEY
>
> By: /S/Katherine Haden
> Katherine Haden
> Susan Kempner
> (713) 567-9000 (telephone)
> (713) 718-3404 (facsimile)
> Assistant United States Attorneys
> P.O. Box 61129
> Houston, Texas 77208

## VERIFICATION

Before me, the undersigned authority, personally appeared, Kendall Hopper, Special Agent, Federal Bureau of Investigation, and upon being duly sworn, stated under oath that she has read the foregoing Verified Complaint for Forfeiture In Rem and the facts stated in the complaint in paragraphs 6-34, are based upon either personal knowledge or from information obtained from reports and law enforcement personnel, and are true and correct to the best of her knowledge and belief.

_____
Kendall Hopper, Special Agent, FBI

Sworn to and subscribed before me, the undersigned authority, on this 8th day of September 2008.

_____
Notary Public, State of Texas
My commission expires: January 13, 2011.

TAMELA ALICIA HERRERA
MY COMMISSION EXPIRES
January 13, 2011